BLANCHE TIPTON, Appellant, v. RALPH TIPTON, Appellee.

**DIVORCE:** Husband and Wife—Living Apart by Agreement—Sever-
1 ance of Relation—Desertion. Where a husband and wife never
lived together in the same house, each, by mutual agreement,
living separately in the homes of their respective parents, such
arrangement created a marital relation capable of being severed
by desertion. Whether one party has severed such relation
depends upon the peculiar facts of each case. In the instant
case, *held*, the evidence showed such severance.

**DIVORCE:** Marital Relation—Severance—Intent—Desertion—Statu-
2 tory Period. The mere severance of the marital relation is not
sufficient. The severance must be intentional—wilful—an abnega-
.tion of all duties of the marriage relation with intent not to
return—for the·statutory period.

**DIVORCE:** Wilful Desertion—Reasonable Cause as Element. Wilful
3 —intentional—desertion is not of itself sufficient to justify a
divorce decree. It must be without reasonable excuse. Evidence
reviewed and held to show desertion in instant case was without
reasonable excuse.

**DIVORCE:** Desertion—Reconciliation Refused—When Justified. A
4 wife suing for divorce is not precluded from relying on desertion,
though she has no affection for her husband and dislikes him and
refuses reconciliation, when her state of feeling toward her hus-
band is the result of his own evil conduct. Evidence reviewed
and held to show that defendant's own conduct justified plaintiff
in refusing to live with him.

**DIVORCE:** Reconciliation—Offer After Accrual of Cause for Di-
5 vorce—Effect. An offer of reconciliation by a guilty spouse after
the expiration of two full years of desertion without cause does
not obliterate his offense and so deprive the innocent spouse of
the right to a divorce.

**DIVORCE:** Right to Divorce Established—Eleventh-Hour Promise
6 to Reform. When one party to the marriage has fully shown a
right to a divorce, and demands it, the court has no power to
deny such divorce simply because the other party on the trial
promises to return to the marital relation.

*Appeal from Warren District Court.*—HON. W. H. FAHEY,
Judge.

WEDNESDAY, FEBRUARY 17, 1915.

BOTH parties assert they are entitled to a decree divorc-
ing them, each charging the other with wilful desertion. The
trial court denied all relief to both. The plaintiff, the wife,
alone appeals.—*Reversed* and *Remanded.*

*Berry & Watson,* for appellant.

*O. C. Brown,* for appellee.

SALINGER, J.—I. Though defendant responds to the alle-
gation of plaintiff that the parties lived together until October,
1910, by answering that plaintiff never did live with him, and
though we concede they did not "live to-
gether," as husband and wife ordinarily do,
we have no occasion to give these contentions
and the departure of the parties from the
standard marital relation any exhaustive con-
sideration. Whatsoever they did or failed to do before October
was on mutual arrangement, and for mutual convenience, and
will afford neither a ground for invoking judicial action
against the other. Indeed, none is invoked. Both declare that
no fault is found with what occurred before October, 1910,
and the desertion charged is based wholly on what occurred
after that time. Where the mutual conduct and the relation-
ship maintained contents both parties, the courts are not called
upon to standardize conjugal conduct and relationship, and
will not divorce parties because they have departed more or
less from such standard. But while that which was done upon
consent prior to desertion cannot be a basis for granting a
divorce, for reasons stated later, we must consider it. At this
time we consider it, first, on whether there was a marital rela-

1. DIVORCE:
husband and
wife: living
apart by
agreement:
severance of
relation:
desertion.

tion to sever—and we hold that there was. Second, we must consider it to determine whether the conduct of defendant after October so differed from what it was.before as that the difference proves he has severed the marital relation. Ordinarily, it is easy to determine whether there has been a separation. Though separation and desertion are not synonyms, though it is neither true nor essential that the two occur the same instant, though there may be separation without desertion, and though there may be desertion without physical separation by removal to a different domicile,—see *Kupka v. Kupka,* 132 Iowa 191,— it remains true that, ordinarily, this element in the proof is made out by showing that the alleged guilty party has removed from the place in which theretofore the parties lived together in the usual way. Whether this defendant severed the relationship cannot be so determined, because the parties did not live together in the usual way. The wife was immediately after the marriage taken to the home of her parents. From then until October 10, 1910, her father supported her. In strictness, defendant never made his home where he had placed the plaintiff, and up to October the marital relation was maintained by visits of defendant at the home of her parents several times a week, and by occasional short period visits of the wife at the home of his parents. If, then, the defendant severed the marital relationship, it must be by conduct so differing from what it had been before October 10, 1910, as that therefrom a separation from his wife appears as clearly as though the two had been constantly living in their own house, and defendant had removed himself therefrom.

It is not and cannot well be denied that the conduct of the defendant subsequent to October 10, 1910, does differ from what it had been before. While prior to October, 1910, there was a failure to support a wife not in ill health, thereafter there was a failure to support a sick wife and a baby which was born in 1911. While prior to October, 1910, the parties were on friendly terms and at times at the homes of their

respective parents, thereafter, and up to the time of the trial, the defendant had no communication whatever with plaintiff and attempted none. Though advised of her serious illness, and of that of his baby, and though sent for by the wife, he made no response in person or otherwise. He never saw the child, nor attempted to see it, until the day of the trial. It does not appear that he caused it to be brought to the trial, or knew that it would be there; nor that he displayed any sign of natural affection when he did see it. This is emphasized because defendant swears on the trial that he was then willing and able to care properly for both wife and child without a claim that he was not as able earlier.

We hold: (1) Though the manner of living together is a departure from the usual in marital life, if the parties are content therewith, it creates a relation which may be severed in the sense of divorce law. (2) There can be no hard and fast rule as to what constitutes such severance, and whether one party has severed the relation must ordinarily depend upon the facts of each case. (3) The evidence shows the defendant did sever the relationship.

2. DIVORCE: marital relation: severance: intent: desertion: statutory period.

II. But mere severance of the relation is not sufficient. There must be a wrongful intent to desert, continued for the statutory period. This, however, means merely that desertion must be intentional.

"The act is wilful when there is a design to forsake the other spouse wilfully, or without cause, and thereby break up the marital union; deliberate intent to cease living with the other as spouse; abnegation of all duties of the marriage relation, not to return.

"Desertion consists in the actual ceasing of cohabitation and the intent in the mind of the offending party to desert the other." *Kupka v. Kupka,* 132 Iowa 191, at 193, and cases cited.

We think that what we have set out as being proof that defendant severed the relation between plaintiff and himself, and evidence which we discuss later on other branches of our inquiry, establish the second element—that the desertion was intentional, and that the intent continued for the statutory period.

III. While thus two necessary elements have been established, this will not suffice. The act of separation, and the continued intent to remain separate, must be wrongful in the sense that there is no reasonable excuse for the one who separated with such intent. The real conflict in this case is on this head. In substance, the real defense attempted is that plaintiff was and defendant was not in fault.

3. DIVORCE: wilful desertion: reasonable cause as element.

What shall herein be said on this head should not be misunderstood. To determine whether defendant entertained a wrongful, because inexcusable, intent to desert, an analysis of and pronouncement upon alleged misconduct of each party, and of excuses offered for conduct, is necessary. But we are not attempting to decide whether the misconduct discussed is or may be a ground for divorce. Here, plaintiff is not entitled to a decree except upon proof that she has suffered a statutory desertion. To determine that ultimate question, conduct which of itself is no ground for divorce and evidence addressed to a ground for divorce other than desertion may or may not be relevant. Nonsupport is no ground for divorce; blows inflicted might warrant a decree on the ground of cruel and inhuman treatment, or might fall short of doing so—but the nonsupport or the blows might or might not be relevant on the ultimate question of whether there has been an unjustifiable desertion within the meaning of our statute. These and kindred lines of testimony may or may not have probative value on this ultimate question. *Kupka's* case, 132 Iowa [191] at 195; *Smith v. Smith*, (N. J.) 37 Atl. 49, 52.

Our discussion of alleged misconduct and as to whether, if it exists at all, it was without excuse, is merely a method

for determining whether or not there has been a statutory desertion; and what is said in the course of it decides nothing except the bearing such misconduct, and the like, has upon whether defendant has unjustifiably deserted—an ultimate question which involves whether he separated himself from his wife with a wrongful intent to desert.

### 1.

The misconduct of plaintiff, which is urged as a warrant for denying her relief, is presented by the answer as follows:

A. Defendant urged her to live with his parents. She refused to do this, and has persisted in living with her parents; and she has not lived with him.

B. About October 10, 1910, he arranged to commence housekeeping with plaintiff; that he arranged for a house and ground, and bought certain provisions; that he urged his wife to come to him in fulfillment of her obligations as a wife in order that a home for both might be made—and that she wholly refused to comply, and persisted in remaining at the home of her parents.

If there was a request that the wife change to living with his parents, it must have been one made before October, 1910. For defendant pleads and attempts to show that the request which he made about and after October 10th was not one to live with his parents, but to live with him in a house which was not the home of his parents. We are fully persuaded the record does not sustain a claim that there was either request or refusal to change the mode of life pursued by plaintiff up to October. While defendant does testify broadly that his wife deserted him and would not come to make her home with his people, and that he could have "taken her home" if she had wanted to go, there is no evidence that his parents were ever willing to let the couple make their home with them; and defendant says, in terms, that he took her to the home of her parents because he had no home for her. Plaintiff's statement that he never asked her to live with his folks, and that she remained with her own because he wanted her to do

so, is fully sustained by the record. All the attendant circumstances and the great weight of all the testimony establish the fact that her remaining at her father's home before October 10th was an arrangement natural under all the conditions existing, and one entered into and maintained by mutual consent, for mutual convenience. At the time of the marriage the mother of the plaintiff was in such helpless physical condition as to supply one natural reason for a consent that the daughter might, for a time at least, remain with her. Defendant himself testifies that his wife wanted to remain with her father because the father had a broken leg; that she desired to stay with him until the leg was well, and that it was in accordance with this request that he went to his folks. While, because he has not appealed, his dismissed cross-petition is not, in strictness, to be treated as a pleading in the case, it is still in the record in the sense that its admissions are competent against the one who filed it—and it is therein pleaded that the daughter desired to remain with the father until he recovered; that at the same time she requested the defendant to remain with his parents until some arrangement could be made for their living together, and that he complied with her request. It appears by a clear preponderance that early in July he arranged for her staying until her confinement, which was thought to be due January following, was passed. So far from complaining of her living at the home of her father, he seeks to excuse himself for not visiting her there more frequently on the ground that his work made it practically impossible for him to be with her more; and he asserts that she acquiesced in this and made no objection to his thus attending to his business.

It is very clear that plaintiff was guilty of no misconduct in remaining at the home of her father up to October 10, 1910.

2.

The next contention is that refusing to go to housekeeping, on request made about October 10, 1910, is misconduct.

Unless we reabstract the record in this opinion, it is impossible to do more on this head than to point out the ultimate deductions which we find should be drawn from the evidence. It so appears that about October, 1910, the husband and wife came to an understanding that some time in the next spring they would remove to South Dakota, and so far from then feeling unwilling to live with her husband, she made preparations for that venture. Somehow, defendant concluded it would be an aid to the Dakota project to begin a temporary housekeeping between the middle or end of October and the coming spring, and he requested her to co-operate. By way of arranging for this, he obtained the consent of his family that the couple might live in a house then vacant, on a farm then leased by his folks. He says he thinks the house was all right because a family had lived in it the year before; it looked nice; that he does not know how many rooms it had; that it had a roof, but he couldn't say whether it was good or not. By way of further arrangement he bought two barrels of apples, quite a quantity of tomatoes and cans to can them in, and he also provided for all the potatoes they would want to eat, and for fuel. He provided no furniture, but his mother says that he told plaintiff she could get anything she wanted, and that "he would pay for it and set up housekeeping." There is nothing to show he had credit, and his own testimony, perhaps colored by the fact that alimony was in issue, indicates he had no means. This sums up the preparations for this housekeeping; and it corroborates the claim of plaintiff that defendant never offered to furnish her a home, any place. The plaintiff responded to this request by letter. Considering her evident inability to express herself aptly in writing, the letter shows an affectionate interest in him. As to the request, she writes: "Ralph, I just can't come down," which is preceded by a statement that she does not feel a bit well. She adds: "Oh, Ralph, don't think about keeping house until spring. I will either be better or be a thing of the past." She writes she hasn't done much that

week, and that her mother may not go to Dakota with her father as the latter desires, because she (plaintiff) guesses her mother is afraid to leave her. This letter is relied on as the main evidence of a refusal which constitutes misconduct. We do not so view it, and think that such refusal as the letter amounts to is not unjustified, and is not misconduct. It should be borne in mind that in July preceding, defendant had arranged with plaintiff's father that she should remain at the father's home until her confinement was passed, and that this proposed arrangement to go to housekeeping not only overturned that arrangement, but contemplated, as a temporary aid for removal to Dakota, that the wife, then within two or three months of her confinement, should in the winter season go to housekeeping in a "home" thus, and thus only, provided. Moreover, the Dakota project was not only abandoned by the defendant, but he claims he informed his wife of that fact early in the year 1911; so that had she gone to this place, if there was one to go to, the reason given for moving there at all would have ceased to be a reason shortly after she had made the change.

This failure to join in the proposed housekeeping was in the circumstances not unreasonable, and did not justify the conduct of defendant thereafter. *Kupka's* case, 132 Iowa at 193-194; *Smith's* case, *supra*.

3.

In this connection it becomes necessary to consider a claim that the action is, in any event, prematurely brought, because the letter written by the plaintiff in some way created a time limit which did not expire until the spring of 1911, and that no desertion could begin until then. This proceeds on the theory that the letter was a refusal to live with plaintiff until the spring of 1911 arrived, that this was acceded to, and that plaintiff may not agree to be separated during a fixed period and make separation for that period the basis of claiming a desertion. In our opinion, this contention is not tenable.

In the first place, the letter made no request for such an arrangement and it obtained none such.  An affectionate request to defer housekeeping until spring, made by one who on consent was to live with her parents until her confinement was over, was not yet confined, and was sick when she asked such postponement of housekeeping, is neither a refusal to live with her husband until spring nor a consent that there shall be a separation until spring.  At most, it is a request that the arrangement made for her living at her father's be not changed till spring.  In essence, it was a plea that no housekeeping be started then because she was too ill, and a request for mere indulgence in beginning housekeeping, which housekeeping was an illogical, quickly abandoned and inopportune makeshift pending a removal to another state.

Next, as defendant made no response, and there was, therefore, no agreement reached, it cannot well be claimed that between October and the spring following he acted under the belief that for that period he was living apart under agreement to resume cohabitation at the end of the period, and that, therefore, there could be no intent to desert until that period had ended.  Of course, if he entertained such belief erroneously, but in good faith, his mere absence up to the spring of 1911 would not prove such intent.  But we feel that he did not so believe.  Clearly, the letter itself gives no ground for it.  He soon abandoned the plan of going to Dakota, and any claimed agreement covers only such absence on his part as was made necessary to carry out his ideas of preparing for the removal to Dakota.  If he believed that they would live together and go away together in the spring, how can it be accounted for that between the receipt of the letter and the end of the period covered by such claimed agreement he ceased visiting her and had no communication with her?  During that period he failed to visit her in confinement, and her child in its sickness, though sent for.  In his answer he declares that he has neither knowledge nor means of information as to how mother and child obtained support.  Was this the conduct

of one who had no intent to abandon the relations and duties of a husband and who believed that while there was an agreement to delay housekeeping for a fixed time, he and his wife would soon assume full conjugal relationship? We are constrained to believe that the period between October, 1910, and the spring of 1911 is not to be subtracted from the time in which an intent to desert was entertained; that the intent to desert present after the spring of 1911 was in existence before —and hold that the suit was not premature.

IV. From October 10, 1910, to the time of the trial, defendant, as said, had no communication with plaintiff, and attempted none. Though advised of the wife's serious illness, that a child had been born and, later, that the child was sick unto death, and though sent for by the wife, he responded in no manner. So far as appears, he made no inquiry as to the condition of the mother or as to the birth of the child, and made none after the child was born. He declares in his answer his supreme indifference by stating that he has neither knowledge nor information sufficient to form a belief as to how the wife and child had been kept alive during some two years. He never saw the child until he saw it on the trial. It does not appear that he caused it to be brought there, or knew that it would be there, nor that he displayed any sign of natural affection when he did see it. Yet he insisted on the hearing that he had affection for the child, and we are asked to believe him when he then said that he was then willing and able to care properly for both wife and child. He makes no explanation why he was not able to do this earlier, and why he made no attempt to do it.

The record presents the following excuses for defendant's failure to visit or hold communication with his wife, and for his treatment of his wife and child. He says he was not notified when the child was born; that at the time it was born he was working away from home at some place, he does not "just remember." This, however, is coupled with the statement that he heard of the birth within three or four days, but

did not go to see about it; that he "never went near." Another statement is, that he can hardly say why he made no effort to see the baby, and did not see it until the trial, and that, for another thing, "he didn't just exactly like to make the neighbors gossip out of it more than anything else. That is the only reason I can say. By neighbors' gossip I mean that when we wasn't living together it looked kind of bad, you know, for a person to go out to meeting any place like that, and I kind of hated to not being around the child myself and the way I never did, I never was a great hand over children."

Finally, he gives his conclusion that he "wasn't wanted over there"; that at first her father made him feel pretty welcome, but after a while he acted as if he did not care whether he came or not; that he got so he only spoke to him on the street when they met; that he took the hint from this that he wasn't wanted up here and, therefore, he didn't care to go there. He both limits and amplifies this by a statement that his wife wrote him in a letter, which he believes he can but does not produce, that her father was mad at him and that he so had orders to stay away—that this was one of the main reasons for his not going. While his claim that the testimony as to this letter is not denied by plaintiff is technically true, it does not follow that the existence of the letter is established, or that the excuses of defendant are valid. His theory on this head is not undisputed. It is met by the circumstances, by the testimony of plaintiff's father that he knows of no reason why defendant did not come; that they had no trouble whatever; that he was particular not to let him know his visits were distasteful or to let it be known that he did not care for him to remain there, and that he talked to him in a friendly way. Defendant's contention is also met by the fact that when his mother went to see the sick baby, she was treated nicely, and that she informed defendant of it.

V. Defendant urges that the plaintiff is wanting in natural affection for him. That she did not desire reconcilia-

tion—in effect, that she should have no relief because the separation between the parties was really by her consent. It is undoubted that where one who charges desertion complains of a justified departure, and it appears that if it were not for the contumacy of the plaintiff a return could be brought about, such a showing of want of proper affection on part of the complaining party will authorize a court of equity to deny relief on the ground that such absence is, in effect, assented to by him. *Wright v. Wright,* 80 Mich. 572, 45 N. W. 365; *Smith v. Smith,* 55 N. J. Eq. 222, 37 Atl. 49. On the other hand, it is manifest that if the want of feeling on the part of complainant and the absence of a desire for reconciliation is due to the conduct of the defendant, he cannot well defeat relief against him by using a change or want of feeling which is due to his own misconduct. *Smith v. Smith, supra.* Mr. Justice PITNEY, speaking for the Chancery Court of New Jersey in the *Smith* case, well states the principle:

> *"Volenti non fit injuria* does not apply where defendant himself is responsible for the feelings of aversion entertained by the wife. If by his conduct he has alienated her affections and given her good cause to dislike him, and to have no desire to live with him, he cannot take advantage of those feelings to excuse himself for a continued desertion without any serious and honest effort to terminate it."

The case holds, also, that misconduct has probative value on whether refusing to resume relations is due to aversion created by such misconduct. The question is one of evidence.

Plaintiff says that when he left her in October she did want to live with him, and had no other thought or expectation; that for a long time afterwards she was willing to live with him; that she thought well enough of him; that she sent for him when the baby was sick, and that she certainly would not have done this had she not wanted to see him. While, in strictness, it is true she did not ask defendant to resume

*Marginal note: 4. DIVORCE: desertion: reconciliation refused: when justified.*

marital relations, if we assume that in all the circumstances disclosed by the record she should have asked this of him, the foregoing is fairly equivalent to an effort on her part to have him return, made while she desired his return. If we assume that this effort must be continuous, it is true that she did not continue it. She finally reached a state of mind that makes her say that as he just went off and left her she sees no reason why she should want to live with him; that she never said anything to him about it because she thought he did not want to live with her. In time the attitude of the father to his child added to these feelings resting in wounded pride seems to have had its natural effect, and she writes him complaining that she has suffered everything for his sake, and that now he will not notice his own flesh and blood; that she would have tried to live with him but when he would not look at his own baby she just couldn't have the heart to think of living with him. As the decision here cannot be clearer than the facts upon which it is based, we have almost too fully for the purposes of an opinion set out much of the conduct of defendant and have pointed out the weakness of his excuses. These make it fairly plain that the change in the feelings of plaintiff is not merely captious. But there is more.

Defendant was asked if he had not been in trouble "about that time" (probably referring to the time at which he claims plaintiff refused to come to or live with him). He replied that, to his knowledge, he was not in trouble. Being asked if he was not then or shortly afterwards under indictment in that court he answered, "Well, not specially, I think." Being next asked whether it was not an indictment caused by trouble with another woman, he said, "Yes." To the next question, whether at that time he did have trouble with another woman, he answered, "Not that I know of." Then he was asked, "Well, you found it out later on," and he answered, "I don't quite catch your meaning." Finally being pressed with the question, "You found it out later on, anyway, you had been

having improper relations with another woman,"—he made no reply.

Plaintiff testifies that in March, 1912, she was informed defendant had another child named Roy; that its mother wrote her so on a postal card; that everybody says there is such a child; that it is younger than her own and is out west of Indianola, and that since hearing this she had never wanted to live with her husband. The trial judge asked her: "Is there any reason, if he would take you and keep you and provide for you, and live with you as your husband, do you know any reason why you couldn't do that?" She answered: "I couldn't possibly. He is the father of my baby and I will educate her all right. I couldn't possibly live with him. He has got another child, and I don't want to live with him. I am not positive he has had intercourse with any other woman since I married him, but they say he has, he said he had."

There is no denial that he said this.

The text of 14 Cyc., page 620, is, that failure to effect or attempt a reconciliation will not constitute desertion where there is just cause for such failure.

It has been held to be a defense for the wife who departed, justifiably, that after returning from a hospital to the home of her parents she remained away from her husband because he was indifferent. *Kupka's* case, 132 Iowa 195. While we do not agree with the contention in the brief of appellant, that she never refused to live with her husband, we conclude that when she finally did refuse, the refusal was justified.

VI. It is finally insisted that when the defendant testified and informed the trial court that he was now willing and able to live with his wife, and to properly care for her and her child, this was an offer of reconciliation, and that her refusal to accept the same justified the dismissal of her petition which ensued. Having found that the intent to desert existed at all times since October 10, 1910, this attempted reconciliation, if we treat it as such, was made after the

5. DIVORCE: reconciliation: offer after accrual of cause for divorce: effect.

statute period had lapsed, and is not available as a defense, nor a ground for denying plaintiff relief.

An offer of reconciliation by a guilty spouse after the expiration of the statutory period of desertion does not obliterate the offense and so deprive the innocent spouse of the right to a divorce. 14 Cyc. 620.

Waiving, for the sake of argument, the contention that this attempted reconciliation came too late, it must still have been one which the court could reasonably find to be made in good faith, and likely to be fairly carried out. In the *Smith* case, *supra,* there was substantially such an offer of reconciliation and substantially such claim for its nonacceptance. The court held that, assuming what occurred to be an offer of reconciliation, the conduct of the husband in the past was such that his mere promise of amendment, if made, was insufficient; that in such circumstances there should have been some guarantee or assurance—and it is concluded that as to such an issue it is reasonable and fair to judge the future by the past.

VII. Appellee assures us by the brief of his counsel that if there be an affirmance the parties will in all probability, and in the course of time, accept a suggestion of the trial judge and resume relations; that in that event the plaintiff will have a good husband, able to provide for her, and the little girl will have a father to care for her and provide for her education; that they should be left to their own resources to reconcile whatever difficulties may exist between them, and to take up their reciprocal obligations to each other and their child. There is a remark in the *Kupka* case to the effect that there is no good reason why the parties should not adjust their differences, ''which are not serious,'' and fulfil the marital obligations which they have assumed. This, of course, was not intended to state the essence of the decision, and on its face discloses that the differences existing are not serious. Giving to that detached phrase in that deci-

6. DIVORCE: right to divorce established: eleventh hour promise to reform.

sion every reasonable weight, it will scarcely authorize us to proceed upon the lines suggested by appellee.

Passing, for the moment, a graver matter,—the question of our power—this record hardly indicates that defendant is pining for a home in which to cherish his wife and child. Judging the future by the past, an impartial observer finds little basis for the optimism of counsel. One point not before noticed throws a sinister light on the tenderness defendant is likely to display. In the petition, the date of the marriage was fixed as in January, 1910. The answer declared, in at least two places, that it occurred in June. Defendant then went on the stand and in answer to a question which stated that this mistake in date had already been corrected, testified that the marriage took place in June. With the date already corrected, this could have no purpose except to publish that the child born in January, 1911, was begotten out of wedlock.

But, in any event, we have no power to deny divorce because of such assurances as are here given. Such may be given in every divorce appeal, as an inducement to reverse or affirm. Of course, the injured party can forgive and is not obliged to demand a divorce, no matter how much entitled thereto. But how can this court, against the protest of one who demands divorce, and has proven herself entitled to the same, refuse relief because the guilty party is of opinion that if the court will disregard the law a happy marital union may result? Where the court is convinced that the parties may and will become reconciled if there be no divorce, it may have some bearing on determining whether it be conclusively proven that a divorce should be granted. In other words, the feeling of the parties towards each other may be such as to make a reconciliation so very likely as to create a doubt whether, in spite of appearances, any serious wrong was perpetrated by one against the other—but that is surely the limit. We do not exercise the pardoning power, and no matter how sincerely counsel may be of opinion that society will be benefited more by refusing a divorce than granting it, we have no

choice where the requirements of the law are met and a litigant demands what the law grants.

We are constrained to differ from the learned trial judge, and to hold that defendant has been guilty of desertion as plaintiff charges. It follows that there must be a reversal.

VIII. In view of the result below, it is possible that the controversy as to alimony was not given any very considerable consideration, and we feel unwilling, and we might say unable, upon the record presented to us, to undertake decreeing what financial aid this defendant should give to his wife and child. We, therefore, remand this cause for a decree in harmony with this opinion, and with direction that the trial court, either upon the record now made or such additional one as it may order or the parties may desire to present, make provision in said decree for such arrangements by way of alimony as in its judgment the evidence then before it warrants.—*Reversed and Remanded.*

DEEMER, C. J., LADD and GAYNOR, JJ., concur.